UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| SCOTT HUPP AND DONNA HUPP, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 3:12-CV-00375 |
| | § | |
| DAVID DANIELSON, DD | § | |
| PRECISION AND KEMAH | § | |
| HARDWARE AND SUPPLY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This dispute between friends tests the scope of federal courts' power to hear "cases of admiralty and maritime jurisdiction." U.S. Const. art. III, § 2. Plaintiff Scott Hupp seeks damages for injuries sustained while assisting Defendant David Danielson with the purchase and cleaning of his boat. The injuries occurred while the boat was in a boat lift on a canal behind Danielson's home. Danielson now moves to dismiss for lack of subject matter jurisdiction. This Court has considered the parties' arguments, the applicable authorities, and the facts of the case, and determines that maritime jurisdiction exists. The Court therefore **DENIES** Danielson's motion to dismiss.

I.  **BACKGROUND**

On June 23, 2012, Danielson purchased a new 35 Executioner powerboat. The manufacturer promotes the 35 Executioner as offering the "latest in offshore

technology at an affordable price." Fountain Powerboat, Inc., *35 Executioner*, http://www.fountainpowerboats.com/sport/exc35_overview.asp (last visited June 18, 2013).  It includes such features as twin Mercury 425hp 496 cubic inch engines that can reach speeds over 78 miles per hour, along with a spacious cabin. *Id*.

Unfortunately, the first day Danielson owned the boat did not bring the relaxation and enjoyment that one would expect.  His friend Hupp, who was present earlier in the day for an inspection and test run of the 35 Executioner, helped transport the boat to the canal behind Danielson's house.  The canal is a narrow, man-made space that allows the residents of the properties surrounding the canal access to nearby Clear Lake.  When the boat arrived behind Danielson's home, it was floated onto a boat lift and raised for cleaning.  According to Hupp, the hull was less than a foot out of the water, and the bottoms of the drives were still in the water.  Hupp took a break from the cleaning to answer a phone call.  When he returned, he attempted to step onto one of the beams of the boat lift.  The lift failed without warning, causing cables and other parts of the lift to strike Hupp.  Hupp fell against the lift, breaking his pelvis on its beam.  He then fell into the water, sustaining further injuries to his legs and hips.

Hupp brought suit in this Court on March 28, 2013. Danielson now moves to dismiss for lack of subject matter jurisdiction, arguing that the suit does not fall within the Court's maritime jurisdiction.

## II.   STANDARD OF REVIEW

In reviewing a motion to dismiss for lack of subject matter jurisdiction, the standard of review is the same as that for dismissals for failure to state a claim under rule 12(b)(6). *Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992). The "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)).

## III.   DISCUSSION

Federal jurisdiction over matters of maritime law flows from 28 U.S.C. § 1333, the congressional implementation of Article III, section 2 of the Constitution. *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 204 (1971). Federal maritime jurisdiction exists where "the tort occurs on navigable waters and the tort bears a significant relationship to traditional maritime activity." *Sanders v. Placid Oil Co.*, 861 F.2d 1374, 1376–77 (5th Cir. 1988) (citation omitted). The Supreme Court has developed a two-part test with "location" and "connection" inquiries to

determine whether a case falls under maritime jurisdiction. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

### A. The Location Test

"A court applying the location test must determine whether the tort occurred on navigable water or whether the injury suffered on land was caused by a vessel on navigable water." *Id.* at 534 (citation omitted). The first inquiry under the location test is whether the water on which the tort occurred—in this case, the canal behind Danielson's house—is navigable. The Supreme Court articulated the test for navigability in *The Daniel Ball*, which held that waters are navigable "when they form . . . a continued highway over which commerce is or may be carried on with other States or foreign countries." *The Daniel Ball*, 77 U.S. 557, 563 (1870); *see also The Montello*, 87 U.S. 430, 442 (1874) (recognizing that if a waterway is capable of being used for commerce, it is navigable). To be considered navigable, the waters must be "capable . . . of navigation in interstate travel or commerce." *Sanders*, 861 F.2d at 1377; 1 Thomas J. Schoenbaum & Jessica L. McClellan, Admiralty and Maritime Law § 3.3 (5th ed. 2011) ("The threshold requirement under this test is the presence of an 'interstate nexus:' the waterbody in question must be available as a continuous highway for commerce between ports and places in different states (or between a state and a foreign country)."). In its analysis of navigability, the Court considers both whether the canal is part of a "continued

highway" over which interstate or foreign commerce can be conducted and whether the canal itself is capable of being used for commercial activity. *See* Schoenbaum & McClellan, *supra* at § 3.3 ("The second requirement for a determination that waters are navigable for purposes of admiralty jurisdiction is 'navigability-in-fact:' they must be used or capable of being used for the 'customary modes of trade and travel on water." (quoting *The Daniel Ball*, 77 U.S. at 563)).[1]

Danielson disputes this latter requirement, arguing that the water is not navigable because the canal was made "for residents to park their pleasure craft behind their houses, and not to facilitate commercial interstate travel from the . . . neighborhood." Docket Entry No. 12 ¶ 17. But this mischaracterizes the inquiry, which is not whether the canal was created for commercial maritime activity, or even whether such activity is actually occurring, but only whether such activity is capable of occurring: "The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use." *The Montello*, 87 U.S. at 441; *see also Sanders*, 861 F.2d at 1377. The capability of the canal at issue in this case to be used for commercial purposes is demonstrated by a recent case within this circuit in which the district court found that a pipeline canal was navigable because

---

[1] The same test for navigability applies to artificial waterways like the canal in this case. *See* Sanders, 861 F.2d at 1377 (citing *Ex parte Boyer*, 109 U.S. 629, 632 (1884)).

"small commercial vessels—utilized by fur trappers, alligator hunters, and fishermen . . . have entered, and traveled through . . . the pipeline canal." *Landry v. Columbia Gulf Transmission Co.*, No. 04-3290, 2009 WL 4064107, at *2 (E.D. La. Nov. 23, 2009). Commercial fishermen could also use such small vessels in the canal behind Danielson's home. Moreover, on the day in question, Hupp and Danielson had to navigate around a commercial vessel that was blocking the canal, a fact that shows that the canal is indeed capable of being used for commercial purposes. *See* fig. 1, *infra*.



Figure 1. Excerpted diagram of the canal and surrounding subdivision. Docket Entry No. 12-2.

And the canal unquestionably is part of a continued highway of waters which reaches ports in other states and countries. As the Fifth Circuit has shown, this is just a matter of map tracing. The court of appeals concluded that Catahoula Lake in Louisiana was navigable because, through a series of connections to smaller tributaries, it eventually connected to the Mississippi River, "a major

maritime commercial artery" that traverses many states. *Sanders*, 861 F. 2d at 1377–78. In the canal case already mentioned, the district court found that the waterway was navigable in part because it had been used "by uniting with other waters, as a continued highway for commerce with another state or foreign country." *Landry*, 2009 WL 4064107, at *1. Performing the same exercise here, the canal in question "connects to Clear Lake" which "empties into Galveston Bay [,] and Galveston Bay connects to the Gulf of Mexico." Docket Entry No. 19 at 6. The canal is therefore navigable for purposes of maritime jurisdiction.

That brings the Court to the closer question: whether the tort occurred on the navigable canal. Danielson argues that the incident "occurred on the boat lift, which is an extension of the land or shoreline," rather than part of the water. Docket Entry No. 22 ¶ 4. The parties (as well as the Court) did not find a maritime jurisdiction case involving a boat lift similar to Danielson's, so both sides analogize to other structures. Danielson compares the boat lift to piers, wharves and docks, over which courts have found maritime jurisdiction lacking. *See, e.g.*, *Victory Carriers*, 404 U.S. at 206–07. Hupp compares the boat lift to liftboats and dry docks, which courts have found to be part of navigable waters. *See The Robert W. Parsons*, 191 U.S. 17, 34 (1903) (dry dock); *Strong v. B.P. Exploration & Prod., Inc.*, 440 F.3d 665, 669 (5th Cir. 2006) (liftboat); *Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 348–49 (11th Cir. 1994) (dry dock). In *Strong*, the Fifth Circuit held

that a liftboat, which was "jacked up and not 'under sail,' qualifi[ed] as a vessel on navigable waters." *Strong*, 440 F.3d at 669. The Eleventh Circuit has found that a fire occurring on a vessel in dry dock came under maritime jurisdiction because the dry dock constituted navigable waters, and the vessel therefore was in navigable waters at the time of the fire. *Reyes*, 23 F.3d at 348–49. The Fifth Circuit has even gone so far as to find a boat, stored in a marina completely separate from the water for the purposes of "obviat[ing] storage in salt water [and] . . . keeping the boats barnacle free," to be in navigable waters for the purposes of maritime jurisdiction. *See Am. E. Dev. Corp. v. Everglades Marina, Inc.*, 608 F.2d 123, 124 (5th Cir. 1979).

    The Court concludes that a boat lift is functionally closer to a dry dock or liftboat. When a ship is put into dry dock, the water is removed from around the boat in order to perform routine maintenance, such as repairs. *See The Robert W. Parsons*, 191 U.S. at 33–34. There is no functional distinction between a dry dock and a boat lift, which lifts a boat out of the water in order to perform maintenance. Dry docks and boat lifts, unlike docks, piers, or wharves, do not permanently prevent navigation of the water where they operate; a vessel can still, and indeed it must for dry docks and boat lifts to work, navigate into that area of the water where a dry dock or boat lift is situated. And much as one would expect from their flip-flopped names, a boat lift performs a similar function to the liftboat in *Strong*,

which raises a boat out of the water. That the boat is raised above the water does not affect whether it is in "navigable waters" for the purposes of maritime jurisdiction. *See Strong*, 440 F.3d at 669.



Figure 2. Excerpted photograph of the boat lift. Docket Entry No. 19-3.

These facts, coupled with the fact that Hupp intended to perform routine maintenance on the boat at the time he was injured, make the dry dock, liftboat, and those boats stored in marinas most analogous to the boat lift. Accordingly, the location test is met in the present case because the tort occurred on navigable waters.

### B.  The Connection Test

The connection test considers two issues.  The first focuses on the incident to determine whether or not such incident has a "potentially disruptive effect on maritime commerce." *Jerome B. Grubart*, 513 U.S. at 534 (citation omitted).  The second examines the character of the activity which gave rise to the incident, asking whether such activity is substantially related to traditional maritime activity. *Id.*

#### 1.  The Effect on Maritime Commerce

In the first part of the connection test, the court "must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce."  *Id.* (internal citations and punctuation marks omitted).  This requires the Court to contemplate whether general features of the incident, projected to the busiest of commercial waterways, would be likely to disrupt commercial activity.  *Id.* at 538.  The test looks to the "potential effects, not to the particular facts of the incident." *Id*.

The Court finds that the incident in this case has a potentially disruptive impact. If a person were to fall into the water and sustain the injuries that Hupp sustained in a busy port or shipping area, such as the Houston Ship Channel, there would undoubtedly be significant disruption, even if the boat were docked.  *Cf. Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982) (finding that the

collision of two pleasure boats on the Amite River in Louisiana would cause a disruption of maritime commerce by envisioning the effect of such a collision in the St. Lawrence Seaway). This disruption could stem from those observing the incident, as well as those attempting to rescue the injured party and get him or her medical attention. *See Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150, 156 (E.D.N.Y. 2006) (recognizing that an accident taking place on a boat docked in the Bahamas could cause disruption to maritime commerce "in order to provide medical treatment to persons who may have been injured" (citations omitted)); *Mink v. Genmar Indus., Inc.*, 29 F.3d 1543, 1546 (11th Cir. 1994) (finding that a passenger falling into the water could disrupt commerce by distracting the vessel's pilot). Moreover, a malfunctioning boat lift poses a threat to boats in its vicinity, which may cause disruption to maritime commerce if the boat were located on a busy seaway. *Burke*, 464 F. Supp. 2d at 156.

### 2. The Activity's Relationship to Traditional Maritime Activity

If the first prong of the connection test is met, the court must then determine if the "character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Jerome B. Grubart*, 513 U.S. at 539. This test looks to the behavior of the alleged tortfeasor rather than to that of the plaintiff. *Id.* at 541. Danielson's activity at the time of the accident was cleaning the boat. The Court is convinced that "cleaning a ship . . . would likely be

considered a traditional maritime activity." *Harris v. Flow Int'l. Corp.*, No. 3:06-cv-12-J-TEM, 2007 WL 3011267, at *2 (M.D. Fla. Oct. 12, 2007).

Moreover, the Supreme Court has found that "storing [boats] at a marina on navigable waters is close enough" to constitute a substantial relationship to traditional maritime activity. *Jerome B. Grubart*, 513 U.S. at 540 (citing *Sisson*, 497 U.S. at 367). In the present case, the boat lift is used for storage. And in *Sea Vessel*, the court found that "routine repair of a vessel in a dry dock . . . bears a significant relationship to a traditional maritime activity." *Sea Vessel*, 23 F. 3d at 351. While the relevant activity here is the cleaning rather than the repair of a boat, both actions relate to maintaining a vessel.

Danielson cites *Poore v. ConAgra Foods, Inc.*, No. 11-CV-44-JHP, 2011 WL 4036165 (N.D. Okla. Sept. 12, 2011), in support of the contention that cleaning a vessel "does not bear a substantial relationship to traditional maritime activity." Docket Entry No. 22 ¶ 21. In *Poore*, the court held that it lacked maritime jurisdiction because the plaintiff's conduct, cleaning a vessel at port, was not substantially related to maritime activity. *Poore*, 2011 WL 4036165, at *4. The court emphasized that the injury did not take place while the boat was in navigation and that "there [was] no evidence that [plaintiff's] action of cleaning or the objects involved in the injury . . . [were] unique to a maritime setting." *Id*. at *3–4. As previously discussed, this Court finds that Danielson's boat was still in

navigation.  Further, the cleaning and objects involved in this particular inquiry—the boat lift and the cleaning of the boat to prevent saltwater corrosion—are unique to a maritime setting, unlike the ladder and platform involved in *Poore*.

## IV. CONCLUSION

For the reasons discussed above, the Court has maritime jurisdiction over Hupp's claims.  Therefore, the Court **DENIES** Danielson's motion to dismiss for lack of subject matter jurisdiction (Docket Entry No. 12).

**IT IS SO ORDERED.**

**SIGNED** this 24th day of June, 2013.

                                                                   _____
                                                                                    Gregg Costa
                                                                       United States District Judge